968 F.2d 1222
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Levi Keith JONES, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jeanette ALLBRITTEN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles STEEL, Defendant-Appellant.
 Nos. 89-50474, 89-50475, 89-50593, 89-50682 and 89-50596.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 6, 1991.
Submitted March 8, 1992.*
Decided July 15, 1992.
 
 Appeal from the United States District Court for the Southern District of California; Nos. CR 88-0936-ER-06, CR-88-0936-ER-09 and CR-88-0936-ER-4, Edward Rafeedie, District Judge, Presiding.
 Appeal from the United States District Court for the Southern District of California; Nos. CR-88-0936-ER-T-02, CR-88-0936-ER-T, Howard B. Turrentine, District Judge, Presiding.
 S.D.Cal.
 AFFIRMED.
 MEMORANDUM**
 Before: PREGERSON, CYNTHIA HOLCOM HALL, and BRUNETT, Circuit Judges.
 
 
 1
 An 18 month investigation of a large scale cocaine distribution network headed by Robert Moore resulted, on February 2, 1989, in an indictment of twenty-two persons for various offenses connected to narcotics distribution ("Moore Indictment"). Five co-defendants' appeals, challenging their convictions and/or their sentences are consolidated here.
 
 I. Jeanette Allbritten
 
 2
 Beginning in 1986 Keith Dunn began purchasing quantities of rock cocaine from Robert Moore for distribution. In early 1987 Dunn joined the Moore distribution operation. Sometime in 1987 Dunn made two cocaine deliveries to Moore at 733 Woodrow Street, San Diego, a residence owned jointly by Allbritten, Robert Moore's aunt, and her husband. Dunn, who later became a government witness, testified that the purpose of the deliveries was to enable Moore to "cook" powdered cocaine into "rock" form.
 
 
 3
 On November 15, 1988, after Dunn became a government informant, a federal search warrant was executed at 733 Woodrow. The search revealed a large quantity of narcotics along with other incriminating evidence. Allbritten was arrested and eventually charged in the Moore Indictment with conspiracy to distribute and distribution of cocaine base, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Allbritten was convicted of both counts and sentenced under the Guidelines to 120 months.
 
 A. Sufficiency of the Evidence
 
 4
 Allbritten challenges the sufficiency of the evidence to support her conviction for distribution, and conspiracy to distribute cocaine base. There is sufficient evidence to support a conviction if, reviewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Adler, 879 F.2d 491, 495 (9th Cir.1988) (citations omitted).
 
 
 5
 To sustain a conviction under § 841(a)(1), the government must prove that Allbritten had dominion and control of the narcotics discovered at her residence. United States v. Castillo, 866 F.2d 1071, 1086 (9th Cir.1988). Dominion may be proved by actual physical custody or constructive possession. Id. Constructive possession of an object is established if a person has sufficient control "to give him power of disposal." Id. The government may rely on circumstantial evidence to show a sufficient connection between a defendant and contraband to "support the inference that the defendant" had constructive possession of the substance. United States v. Disla, 805 F.2d 1340, 1350 (9th Cir.1986). Allbritten argues that there was insufficient evidence either that she actually possessed the narcotics found at her residence, or that she exercised dominion over them.
 
 
 6
 In searching the Allbritten's residence the police discovered the following items: (a) in the kitchen, more than 50 grams of cocaine in a cookie tin along with money wrappers; (b) in the garage, a box containing a triple beam scale, baggies, and other items containing cocaine residue; (c) on a washing machine, foil wrappers containing narcotics residue; (d) in a bedroom, a floor safe containing $87,000, a release of tax lien in the names of Robert Moore and Allbritten, an escrow document for another property in Allbritten's name, and a check made out to her by a third party and returned for insufficient funds; (e) in the master bedroom, various documents relating to ownership of vehicles and property by Robert Moore and Rachel Wofford (Moore's sister). The agent responsible for the search of Allbritten's house testified that the items seized indicated a large scale cocaine operation had been conducted on the premises.
 
 
 7
 The foregoing evidence supports the jury's conclusion that Allbritten had constructive possession of the narcotics found in her kitchen. Indeed, any other conclusion is difficult to support. Agents found evidence of cocaine trafficking throughout the Allbritten house. Many of the items seized actually contained cocaine residue. Moreover, Allbritten's name was on documents found, in the floor safe, near probable narcotics proceeds. The jury reasonably could have connected the documents and money found in the safe with the other contraband scattered throughout the house and, in turn, with more than 50 grams of cocaine found in a conspicuous location in her kitchen.
 
 
 8
 Allbritten also challenges the sufficiency of the evidence to sustain her conspiracy conviction. To support a charge of conspiracy to possess with intent to distribute narcotics, the government must demonstrate both the existence of a conspiracy and one or more acts by Allbritten connecting her to the agreement and in furtherance of the illegal purpose. United States v. Penagos, 823 F.2d 346, 348 (9th Cir.1987). Allbritten argues there is insufficient evidence to connect her to the Moore operation.
 
 
 9
 Evidence tying Allbritten to the Moore narcotics conspiracy need only demonstrate a slight connection. Penagos, 823 F.2d at 348. The real estate documents and returned check in the floor safe containing Allbritten's name, located in proximity to probable narcotics proceeds, in conjunction with the cocaine and other contraband discovered at the Allbritten residence was sufficient to establish more than a slight connection.
 
 B. Jury Instruction
 
 10
 Allbritten also challenges the jury instruction on aider-abettor liability. She did not challenge the instruction at trial and thus we consider the instruction for plain error. United States v. Armstrong, 909 F.2d 1238 (9th Cir.), cert. denied, 111 S.Ct. 191 (1990).
 
 
 11
 The trial court issued a proper instruction on the definition of possession. Allbritten does not object to the possession instruction itself, but asserts that a later instruction on aiding and abetting, when coupled with the possession instruction, "implies that the jury could find the appellant guilty if she exercised dominion and control over the cookie tin in her kitchen [in which the cocaine was discovered] without knowing that it contained rock cocaine." That instruction stated:
 
 
 12
 The guilt of defendants ... may be established without proof that the accused personally did every act constituting the offense charged.
 
 
 13
 Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or procures its commission is punishable as a principle.
 
 
 14
 Whoever willfully causes an act to be done, which if directly performed by him or another would be an offense against the United States, is punishable as a principle.
 
 
 15
 In other words, every person who willfully participates in the commission of a crime may be found to be guilty of that offense. Participation is willful if done voluntarily and intentionally, and with the specific intent to do something the law forbids, or with the specific intent to fail to do something the law requires to be done; that is to say with bad purpose either to disobey or disregard the law.
 
 
 16
 Allbritten argues that by allowing the jury to find her guilty without "proof that the [she] personally did every act constituting the charged offense," the jury was permitted to attribute constructive possession (a necessary element) to Allbritten without finding that she had knowledge of the contraband.
 
 
 17
 The instruction does not amount to plain error. Although the charge speaks of guilt without proof of every act constituting the charged offense, the remainder of the instruction is sufficient to inform jurors that it refers to physical acts that may constitute aiding and abetting, rather than to a lessor quantum of evidence necessary to demonstrate constructive possession.
 
 C. Conclusion
 
 18
 We find no merit in any of Allbritten's objections to her conviction and therefore affirm the judgment of the district court in its entirety.
 
 II. Levi Jones
 
 19
 Jones was charged, in the Moore Indictment, with conspiracy to possess with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1) and § 846. He pleaded guilty to this charge and was sentenced under the Guidelines to 144 months. He challenges his sentence on appeal.
 
 
 20
 Jones was a distributor in the Moore operation. He dealt almost entirely with Keith Dunn and had almost no direct contact with the leaders of the conspiracy (Moore and Rachel Wofford). According to the Presentence Report ("PSR"), Jones began selling cocaine in 1986 and at some point began purchasing cocaine from the Moore group. Jones eventually required a greater supply and contacted Keith Dunn who, he believed, could provide large quantities of cocaine base. At some point Jones appears to have become an employee of the Moore operation. He was advanced quantities of cocaine and would receive a share of the profit after distribution.
 
 
 21
 Sometime around May 1987 Jones stopped dealing with Dunn. This appears to be related to his fear of Robert Moore or his general distaste for Moore's propensity for violence. He returned to the Moore operation for his cocaine supply sometime later and, he claims, again stopped dealing with Dunn and Moore in July 1987. It is not clear what connection Jones had to the Moore operation after July 1987, although it appears Jones continued to sell cocaine until January 1988. In January 1988 Keith Dunn was shot and severely injured, apparently at the behest of Robert Moore, and Jones claims he got out of the cocaine business entirely at that point. Although Jones did not handle cocaine purchases after January 1988, he admits he acted as a middle man, referring those looking for rock cocaine to sources.
 
 A. Sentencing
 
 22
 Jones argues on appeal that he should not have been sentenced under the Guidelines. Although he pleaded guilty to a conspiracy that began in 1986 and, according to the indictment, did not end until November 1988, Jones asserts he withdrew from the conspiracy in July 1987. Because the Guidelines apply only to crimes committed after November 1987, Jones argues he should have been sentenced under pre-Guidelines rules. He asserts application of the Guidelines to his offense operates as an ex post facto increase in the punishment associated with his crime.
 
 
 23
 Whether Jones' crime occurred after the effective date of the Guidelines is a question of fact. The district court's determination with regard to that fact will not be disturbed unless it is clearly erroneous. United States v. Gross, 897 F.2d 414, 416 (9th Cir.1990).
 
 
 24
 Although this circuit has not considered the issue, others have held there is no ex post facto violation when the Guidelines are applied to a conspiracy that begins before November 1987 and continues thereafter. See United States v. Walker, 885 F.2d 1353 (8th Cir.1989); United States v. Boyd, 885 F.2d 246 (5th Cir.1989); United States v. Sheffer, 896 F.2d 842 (4th Cir.), cert. denied, 111 S.Ct. 112 (1990). Because conspiracy is a continuing offense, it is logical to consider the crime as having been committed at the date of its cessation. See United States v. White, 869 F.2d 822, 826 (5th Cir.), cert. denied, 109 S.Ct. 3172 (1989). We follow the rule that application of the Guidelines to a conspiracy that began prior to November 1987 and continued thereafter is not an ex post facto increase in punishment.
 
 
 25
 If Jones withdrew from the conspiracy in July 1987, as he claims, application of the Guidelines might present an ex post facto problem. See United States v. Walker, 885 F.2d 1353, 1354 (8th Cir.1989). Jones' connection to the Moore operation after July 1987 is not clear. Although he pleaded guilty to a conspiracy that continued until November 1988, he asserts that he had no involvement with Moore or his associates after July 1987. The PSR indicates Jones continued to sell cocaine until January 1988, although neither the PSR nor the government indicate this activity was in any way connected to the Moore conspiracy.
 
 
 26
 Whatever Jones' connection to the Moore operation after July 1987, he is responsible for the acts of his coconspirators until the time the conspiracy ended unless he withdrew from the scheme. " 'Withdrawal from a conspiracy requires a disavowal of the conspiracy or an affirmative action that would have defeated the purpose of the conspiracy, or "definite, decisive and positive" steps to show that the conspirator's disassociation from the conspiracy is sufficient.' " United States v. Loya, 807 F.2d 1483, 1493 (9th Cir.1987) (quoting United States v. Smith, 623 F.2d 627, 631 (9th Cir.1980). There is no evidence of such affirmative disavowal or disassociation by Jones. He does not deny he continued to distribute cocaine after November 1987, and although it is not clear whether he obtained narcotics through Keith Dunn or from the Moore operation, there is no evidence he disavowed his connection to that scheme. He is liable for illegal acts in furtherance of the conspiracy committed after November 1987 and application of the Guidelines was proper. We therefore affirm the sentence as imposed.
 
 III. Robert Moore
 
 27
 Moore was charged with various narcotics violations in the Moore Indictment. He pleaded guilty to conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and § 846, and to possession with intent to distribute 495.5 grams of cocaine in violation of § 841(a)(1).[1] As part of the plea agreement Moore also pleaded guilty to a count of subscribing to a false federal tax return, contained in a separate indictment. He was sentenced under the Guidelines to 300 months.
 
 A. Guilty Plea
 
 28
 Moore argues his guilty plea should be set aside because the district court failed to advise him of the extent and nature of the charges against him and in doing so, prevented him from entering a knowing and voluntary plea. A plea should not be disturbed because of a variance from the procedures required by Fed.R.Crim.P. 11 unless it affects a defendant's substantial rights. Fed.R.Crim.P. 11(h). An assertion that a guilty plea was involuntary is considered independently and non-deferentially. United States v. Turner, 881 F.2d 684, 685 (9th Cir.), cert. denied, 110 S.Ct. 199 (1989).
 
 
 29
 In Moore's view the court did not sufficiently "inform [him] of, and determine that [he] underst[ood], ... the nature of the charge to which the plea [was] offered." See Fed.R.Crim.P. 11(c)(1). Although the court discussed the charge with Moore, he asserts it did not inform him that under the conspiracy count he could be held accountable, in sentencing, for acts of coconspirators in furtherance of the scheme. Moore asserts he believed he could only be sentenced for conspiring to distribute and actually distributing the 495 grams of cocaine that were the subject of the March 17 deal. Because he did not understand the true nature of the charge against him, he argues the plea was not knowing and voluntary. See Henderson v. Morgan, 426 U.S. 637, 645 (1975).
 
 
 30
 Moore's argument is without merit. The judge went to great lengths to ensure Moore understood the nature of the offense to which he was pleading, and the minimum and maximum terms to which he could be sentenced. No more is required by Rule 11.[2] During the plea hearing the court described the crime of conspiracy and Moore responded that he understood that offense. The court described the minimum and possible maximum penalty that could be assigned for each count, the operation of the Guidelines, and made sure Moore's plea was not induced by any promise of a particular sentence.
 
 
 31
 In describing his offense, Moore recounted the facts of the March 17, 1988, cocaine deal and the court accepted this offense as the factual basis for Moore's guilty plea to conspiracy to distribute. Apparently both Moore and his lawyer believed the calculation of offense level would be based only on the drugs that were part of the March 17 deal. This mistake in predicting the sentence, however, in no way renders the court's taking and acceptance of the plea in error. See United States v. Garcia, 909 F.2d 1346, 1348-49 (9th Cir.1990).
 
 B. Sentencing
 
 32
 Moore presents three distinct objections to his sentence under the Guidelines. We review the legality of a sentence imposed under the Guidelines de novo. United States v. Turner, 898 F.2d 705, 708 (9th Cir.), cert. denied, 110 S.Ct. 2574 (1990). Findings of fact by the district court are reviewed for clear error. Id. (citing United States v. Sanchez-Lopez, 879 F.2d 541, 557 (9th Cir.1989)).
 
 
 33
 1. Calculation of Base Level: In sentencing Moore, the court arrived at an initial base level of 36, based on the quantity of cocaine involved in the offense. U.S.S.G. § 2D1.1(c)(4). Moore strenuously objected to this calculation because he believed his sentence would relate to the amount of drugs in the underlying substantive offense (i.e., 495.5 grams). Despite his objection, the district court was entitled to base Moore's sentence on the amount of cocaine base involved in the entire conspiracy, and was not limited to the amount involved in the substantive offense to which he pleaded guilty. See United States v. Turner, 898 F.2d 705, 710-11 (9th Cir.), cert. denied, 110 S.Ct. 2574 (1990); U.S.S.G. § 2D1.4.
 
 
 34
 In order to attribute other activities of the conspiracy to Moore, however, the court was required to find other drug sales were in furtherance of the conspiracy to which Moore pleaded guilty. U.S.S.G. § 2D1.4; § 1B1.3, Application Note 1. On appeal, Moore suggests the base level of 36 was impermissibly imposed because the district court did not find that other drugs sales referred to in the presentence report were in furtherance of the conspiracy.
 
 
 35
 There is more than enough information in the presentence report for the district court to find that an additional 5 grams of cocaine base were involved in the conspiracy.[3] In fact, Moore admitted, in a probation statement, to involvement in a kilogram cocaine deal in South Bend, Indiana. Although Moore later denied this involvement, the court reasonably could rely on the admission contained in the PSR, and reject Moore's later denial.
 
 
 36
 The court did not expressly state that the Indiana deal, or countless other narcotics transactions described in the PSR, was in furtherance of the conspiracy. Such a determination is, however, implicit in its statements at the sentencing hearing. Moore expressly objected to use of a base level above 34 (i.e., to inclusion of any drugs other than those involved in the March 17 deal) and the court rejected this argument. The court stated: "I've read and considered the presentence report ... and I've read the matters that you filed in support of your position here this morning. I believe, under the guidelines, I'm entitled to take into consideration the overall amount of drugs involved. I, therefore, will find that this case is a category 36." In light of the large amount of evidence of Moore's narcotics activities contained in the PSR, the court made an adequate "in furtherance of" determination. We find the use of base level 36 was therefore proper.
 
 
 37
 2. Presentence Report: Fed.R.Crim.P. 32(a)(1)(A) requires the district court to ensure the defendant and defense counsel have had an opportunity to read and discuss the presentence report. Moore claims that no such determination was made by the district court and as such the matter should be remanded. See United States v. Popoola, 881 F.2d 811 (9th Cir.1989). The district court made such a determination and Moore's assertion is without merit:
 
 
 38
 "THE COURT: Yes. You've discussed the presentence report with Mr. Moore, I take it?
 
 
 39
 MR. BROOKLIER [defense counsel]: Yes your Honor, and I take it the Court as received our memorandum objecting to the PSR's conclusions."
 
 
 40
 3. Written Findings Under Rule 32(c)(3)(D): Moore correctly asserts Fed.R.Crim.P. 32 requires a district court to attach written findings of its determination of factual inaccuracies in the PSR to the copy of the PSR thereafter made available to the Bureau of Prisons. The district court made a specific determination that the second and third paragraphs of page 21 of the PSR are inaccurate and should be stricken. By failing to attach a written record of this finding to the final PSR, the court violated Rule 32. The district court is ordered to issue a new PSR with its findings attached. See Doganiere v. United States, 914 F.2d 165, 169 (9th Cir.1990).
 
 IV. Charles Steel
 
 41
 Steel was charged in the Moore Indictment with conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and § 846, possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1), and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(9)(1).[4]
 
 
 42
 As part of its investigation into the Moore cocaine operation, police executed search warrants at two apartments in the San Diego area. On January 14, 1988 police searched an apartment at 5310 Rex Street and discovered documents relating to Steel: a laundry receipt, an automotive repair receipt, and an "Own Recognizance" release form. An April 18, 1988, search at 3113 38th street revealed a large quantity of cocaine base and other contraband. Steel was at the 38th Street apartment at the time of the search, but was not arrested.
 
 
 43
 Subsequent to these searches, sometime in October 1988, police entered into a controlled purchase of cocaine from Steel by Ernest Brooks, an informant. Brooks testified at trial that he met with Steel to discuss cocaine purchases sometime shortly before October 20, 1988, although he could not recall the exact date. According to the government's brief the following occurred on October 20, 1988:
 
 
 44
 Brooks went to a residence on 51st street in San Diego in order to meet with ... Steel and purchase some drugs. However, when he arrived at the residence, he met a young woman who told him that Steel was not there, but was available by telephone. She then handed a telephone to Brooks and he spoke with a male whom he believed to be appellant Steel. That individual then directed him to go to another location to buy the drugs. Brooks then went to the other location where he purchased rock cocaine from David Gonzalez [also named in the Moore Indictment].
 
 
 45
 Brooks testified before the grand jury regarding this deal with Steel, and the grand jury based its indictment of Steel on this occurrence.
 
 
 46
 Gail Frey, sister of government informant Keith Dunn, testified that she purchased cocaine at the Rex Street apartment first from Elliot Jones, a co-defendant, and then on numerous occasions from Steel.
 
 
 47
 At trial it became clear that the October 20, 1988, drug deal that was supposed to have involved Steel either never took place, or occurred on some date other than described by Brooks and the government at the grand jury proceeding, in the indictment, and at trial. There was undisputed evidence that Steel was incarcerated in a county jail between October 11, 1988 and October 20, 1988. The alleged October 20 deal is the only act contained in the indictment involving Steel.
 
 
 48
 Steel was acquitted of the substantive count (based in the indictment on the October 20 deal), but was convicted of conspiracy to distribute cocaine.
 
 A. The Brooks Evidence
 
 49
 Steel challenges the February 2, 1989, indictment, and his conviction, asserting that his due process rights were violated because both were obtained through the use of perjured testimony.
 
 
 50
 1. Waiver: Fed.R.Crim.P. Rule 12(b)(2) requires any challenge to an indictment that can be made prior to trial, must be made at that time to avoid waiver. No challenge may be made to the indictment if Rule 12(b)(2) is violated unless, under Rule 12(f), there is a showing of good cause by the defendant. See United States v. Davis, 411 U.S. 233 (1972).
 
 
 51
 Brooks first referred to the alleged October 20 meeting during his grand jury testimony. Steel's attorney concedes that he had the transcript of this testimony prior to trial, and the facts regarding Steel's actual whereabouts on October 20, necessary to challenge the testimony. Defense counsel has not demonstrated good cause for his failure to raise the issue and this objection to the indictment was therefore waived. As appears below, Steel's objection to the Brook's testimony is nonetheless meritless.
 
 
 52
 2. Failure to Inform Court: Steel argues the indictment should be overturned on appeal because the prosecutor used Brook's testimony when he knew the testimony was false. He argues that use of such evidence and failure to inform the defense and the court amount to a violation of Steel's fifth amendment due process rights. He relies exclusively on United States v. Basurto, 497 F.2d 781 (9th Cir.1974), cert. denied, 457 U.S. 1135 (1975). In that case, this court held that when a prosecutor learns a witness has committed perjury before the grand jury, and the perjury was material to the indictment, the prosecutor has a duty to reveal the perjury prior to the grand jury and to the trial court. The court reversed the conviction because the defendant was permitted "to stand trial on an indictment which the government [knew was] based on perjured testimony...." Id. at 787. See also United States v. Spillone, 879 F.2d 514, 528 (9th Cir.1989) (Pregerson, J., concurring in part and dissenting in part), cert. denied, 111 S.Ct. 210 (1990); United States v. Claiborne, 765 F.2d 784, 790 (9th Cir.1985), cert. denied, 475 U.S. 1120 (1986).
 
 
 53
 Steel argues the prosecution knew Brooks testimony was faulty at the time of the grand jury proceeding, and used that testimony at trial, without informing the grand jury, the court, or the defense. Although Steel presents no evidence the prosecution knew, at the time of Brook's grand jury testimony, Steel was incarcerated during the two alleged "meetings" (i.e., one in person and one by telephone) between Brooks and Steel, it is likely the prosecution was aware of this problem. Agent Love, Brooks' police contact, testified that he was aware Steel was in jail on October 20, the date Brooks told the grand jury he had spoken with Steel on the phone about a drug pickup.
 
 
 54
 Although there is no direct evidence, it is very likely the prosecution knew Steel was incarcerated during the period of the alleged Brooks-Steel meetings; that the October 20th date might be attacked at trial, and that Brooks was subject to damaging cross-examination on this point. This is not enough to establish knowing use of perjured testimony, or prosecution failure to reveal such evidence under Basurto. In that case, the prosecution witness informed the government that he had lied in his grand jury testimony. In this case, at best it appears there was serious confusion on the part of the government and its witness with regard to key dates. Brooks stuck with his memory of an October 20 meeting, Steel attacked that testimony at trial, and the jury acquitted Steel of the substantive count that relied on Brook's testimony. We hold the testimony did not violate Steel's due process rights.
 
 B. Challenge to the Conspiracy Conviction
 
 55
 Steel next argues the conspiracy conviction should be overturned because the only overt act contained in the indictment was the charge of his dealings with Brooks which the jury apparently rejected. In his view, because the jury rejected the overt act contained in the indictment, there is insufficient evidence for the conspiracy conviction to stand.
 
 
 56
 There is sufficient evidence to support a conviction if, reviewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Adler, 879 F.2d 491, 495 (9th Cir.1988) (citations omitted). To sustain a conviction for conspiracy to possess with intent to distribute narcotics the government must demonstrate both the existence of a conspiracy and one or more acts by Steel connecting him to the agreement and in furtherance of the illegal purpose. United States v. Penagos, 823 F.2d 346, 348 (9th Cir.1987). The only issue here is whether the government presented sufficient evidence of Steel's connection to the Moore operation to sustain the conspiracy conviction. The government only need present evidence of a slight connection. Id.
 
 
 57
 Because the jury acquitted Steel of the substantive count relating to the alleged meetings with Brooks, the government cannot rely on this to support the conspiracy conviction. The government presented the following additional evidence: a search at 5310 Rex Street revealed contraband and three documents the jury could have believed were tied to Steel (laundry receipt, auto repair receipt, "OR" release form); Steel was present when police conducted a subsequent search at 3118 38th Street during which a large quantity of cocaine was recovered; Gail Frey testified that Steel provided drugs to her on several occasions and was present on at least once when she bought drugs from Elliot Jones, a member of the Moore operation.
 
 
 58
 The two searches tie Steel to the Rex Street apartment, the site of much of the drug activity in this case, and to other conspirators present at the 38th Street search. The Frey testimony is sufficient, when combined with the other evidence, to lead a rational trier of fact to find that Steel was connected to the Moore narcotics distribution scheme.
 
 C. Gail Frey Testimony
 
 59
 Steel presents two objections to the testimony against him of Gail Frey.[5]
 
 
 60
 1. Admission of the Testimony: In its opening argument the government referred to the testimony of Frey. The prosecution explained that the witness would testify, among other things, that she purchased cocaine from Steel. Steel did not object to this reference. Later Frey was called to testify and eventually referred to her association with Steel. At this point, appearing more than surprised, Steel's counsel objected to the introduction of this evidence and made a motion to exclude reference by Frey to Steel. The trial court allowed the testimony and Steel now argues this amounted to reversible error. We review a trial court's decision to admit evidence for abuse of discretion. United States v. Emmert, 829 F.2d 805, 808 (9th Cir.1987). For reversal appellant must demonstrate prejudice: that the error more likely than not affected the verdict. Id.
 
 
 61
 Steel asserts the government failed to inform him Gail Frey would testify as to drug dealings with him. He argues because he had no notice of her testimony, he was prevented from properly preparing for trial. Finally, he claims that prejudice is clear because Frey's testimony is the only evidence connecting him to the Moore operation.
 
 
 62
 There is no dispute that Gail Frey was not on the witness list submitted to Steel and the court. The prosecution argued and the trial court accepted that Steel was informed sufficiently by a letter from the government to Steel's counsel informing him of "benefits provided to witnesses in relationship to this case." Gail Frey is included among witnesses referred to in that letter. The court also relied on the reference to Frey in the government's opening statement and Steel's failure to object at that time.
 
 
 63
 The government is not required to provide a witness list to a non-capital defendant in this circuit. See United States v. Sukumolachan, 610 F.2d 685 (9th Cir.1980); United States v. Moses, 1990 U.S.Dist.LEXIS 1455 (D.Or.1990). Moreover, Steel has demonstrated no prejudice from the introduction of the Frey testimony. He was informed of her status as a government informant; he did not object to the prosecutor's reference to the Steel-Frey connection in his opening argument; and his counsel at no time requested a continuance to become better prepared to cross-examine Frey. The district court did not abuse its discretion in admitting the testimony.
 
 
 64
 2. Conviction Based on Frey Testimony: Steel next argues his conviction should be reversed because he was convicted upon the uncorroborated testimony of an accomplice (i.e., Gail Frey). He relies on United States v. Hibler, 463 F.2d 455 (9th Cir.1972). In that case, although the court recognized an accused can be convicted solely on the uncorroborated testimony of an accomplice, id. at 458, it chose to undertake a "special obligation to examine the other asserted errors in the conduct of the trial" because not only was the accomplice testimony unsupported by other evidence, but "some of the government's own evidence tend[ed] to contradict, rather than corroborate, the accomplice." Id. Also, in Hibler the "other asserted error" included failure on the part of the prosecution to disclose exculpatory evidence.
 
 
 65
 In this case, unlike in Hibler, there are no facts which require any "special obligation" on our part to review the case. Although it is likely Steel's conspiracy conviction was based in part on the testimony of Gail Frey, her testimony was not unsupported by other evidence. Evidence revealed during the two searches described above supports the jury's conclusion that Steel was a member of the Moore operation. Moreover, although Steel argues otherwise, there is no other significant error in this case. Unlike Hibler, the prosecution did not fail to turn over significant evidence, and although Steel argues the prosecution made knowing use of perjured testimony, this assertion is without merit. We therefore reject Steel's Hibler argument.
 
 
 66
 D. Motions for New Trial and Judgment of Acquittal
 
 
 67
 Steel finally argues the district court improperly denied his motion for a new trial pursuant to Fed.R.Crim.P. 33, and his motion for Judgment of Acquittal pursuant to Rule 29. The new trial decision is reviewed for abuse of discretion. United States v. Lopez, 803 F.2d 969, 977 (9th Cir.1986), cert. denied, 481 U.S. 1030 (1987). Denial of a motion for a new trial based on newly discovered evidence is reviewed for abuse of discretion. United States v. Kenny, 645 F.2d 1323, 1343 (9th Cir.), cert. denied, 452 U.S. 920 (1981). We review the denial of a motion for judgment of acquittal pursuant to Fed.R.Crim.Proc. 29 to determine whether, viewing the evidence in the light most favorable to the Government, there was substantial relevant evidence produced from which the jury reasonably could have found the defendant guilty beyond a reasonable doubt. United States v. Sarault, 840 F.2d 1479, 1487 (9th Cir.1988) (citation omitted).
 
 
 68
 Steel was convicted and judgment was entered on June 20, 1989. The new trial and acquittal motions were filed on August 4, 1989. The trial court denied the motions as untimely pursuant to Fed.R.Crim.P. 29 and 33 which require these motions to be filed within seven days from the entry of judgment. Steel argues the motion for a new trial was not untimely because Rule 33 provides two years to file a new trial motion if the motion is based on newly discovered evidence. He claims that the discrepancies in the Brooks testimony amount to new evidence. It is well established that "new evidence" must be discovered after trial for the two year provision of Rule 33 to apply. See United States v. Steel, 759 F.2d 706, 713 (9th Cir.1985). Steel was aware of the problem with the Brooks testimony before, during, and after trial and as such, we affirm the district court's decision to deny the two motions as untimely.
 
 E. Conclusion
 
 69
 We affirm Steel's conviction its entirety.
 
 II. Rachel Wofford
 
 70
 Wofford, Robert Moore's sister, was charged in four counts of the Moore Indictment. She pleaded guilty to conspiracy to possess with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) and 846. As a factual basis for her plea she admitted that on June 11, 1989 she possessed, with the intent to distribute, 33 grams of rock cocaine. On that date police executed a search warrant at 327 Los Angeles Place, San Diego, the residence of Wofford and co-defendant Larry Daniels. Police recovered 33 grams of cocaine, some other contraband, and a loaded revolver apparently located on a night stand.
 
 
 71
 Wofford was sentenced, under the Guidelines, to 120 months. She now challenges that sentence.
 
 A. Sentencing
 
 72
 The Presentence Report details Wofford's extensive involvement in the Moore distribution operation. Because she was involved in transactions of at least 500 grams of cocaine base the PSR employs a base offense level of 36 pursuant to U.S.S.G. § 2D1.1(c)(4). The offense level is increased by 2 because of the presence of the firearm at Wofford's residence, U.S.S.G. § 2D1.1(b)(1), and by an additional 3 points because of evidence she played a significant managerial role in the Moore operation. U.S.S.G. § 3B1.1(b). Employing a base offense level of 41, and a criminal history category of II, the PSR arrived at a guideline range of 360 months to life, and recommended a sentence of 360 months.
 
 
 73
 The plea agreement entered into between Wofford and the government required the government to recommend a sentence of no more than 10 years. It appears at the time of the sentencing hearing the court was faced with the difficulty, if it were to accept the government's recommendation, of finding a basis for departure from about 360 months (accepting the finding of the PSR) to 120 months. The government made a number of suggestions: (a) that the court recognize an acceptance of responsibility reduction; (b) that the court consider the "controlling interest [Wofford's brother] had in her criminal involvement." Finally, the government's counsel stated:
 
 
 74
 If your Honor were to determine that the defendant's role in this case and her responsibility for the drugs was the amount that she actually admitted by way of her guilty plea, that gives her a level 28 there. Two points for the gun, gives her a Level 30 and acceptance of responsibility gives here a Level 28. Two points, not three, is recommended, but two points for some type of leadership role, brings her Level to 30.... The Guideline range for offense Level 30, [Criminal History] Category 2, is 108 to 135 months.
 
 
 75
 The court adopted this formula and, using a base level of 30 and a criminal history category of 2, sentenced Wofford to 120 months.
 
 
 76
 Wofford has three objections to the sentence: she argues the court made insufficient findings on the record to support the sentence; there was no evidence to support the gun enhancement; and, there was no evidence to support the leadership enhancement. She also challenges the criminal history calculation. We review the legality of a sentence de novo. United States v. Turner, 898 F.2d 705, 708 (9th Cir.), cert. denied, 110 S.Ct. 2574 (1990).
 
 
 77
 Wofford's contentions are without merit. The district court's findings are well supported by the evidence. Moreover, any error by the district court in calculating Wofford's criminal history category does not require resentencing. Using a base offense level of 30 and criminal history category II, the district court sentenced Wofford to 120 months imprisonment, near the middle of the corresponding guideline range (108 to 135 months). Using the correct criminal history category I, Wofford's guideline range would be 97 to 121 months. Because the district court's sentence is still within this range, Wofford cannot complain. United States v. Pelayo-Bautista, 907 F.2d 99, 102 (9th Cir.1990) (we lack jurisdiction over an appeal "that a defendant's sentence within a guidelines range should have been more lenient").
 
 Conclusion
 
 78
 Jeanette Allbritten's conviction is AFFIRMED. Levi Jones' sentence is AFFIRMED. Robert Moore's conviction and sentence are AFFIRMED, and the district court is ordered to issued a new Presentence Report with its findings attached, in accordance with this memorandum. Charles Steel's conviction is AFFIRMED. Rachel Wofford's sentence is affirmed.
 
 
 79
 AFFIRMED.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a); Circuit Rule 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Circuit Rule 36-3
 
 
 [1]
 Although there is a large amount of evidence connecting Moore to the operation, his eventual arrest resulted from a purchase of cocaine base by a confidential informant. On March 16, 1988 the informant contacted Moore in order to buy narcotics and the next day he delivered a bag containing the 495.5 grams of cocaine to the informant
 
 
 [2]
 Rule 11 requires that the defendant understand the nature of the charge (i.e., the elements of the crime), any applicable minimum and maximum sentences, and the fact that the court is required to consider the applicable sentencing guidelines but may depart from those guidelines. There are, of course, further requirements that are not applicable here
 
 
 [3]
 Because Moore admitted to possession of 495.5 grams during the March 17 deal, the court only needed to find an additional 5 grams to employ a base level of 36 under U.S.S.G. § 2D1.1(c)(4)
 
 
 [4]
 The firearm charge was dismissed at trial and is not the subject of this appeal
 
 
 [5]
 This witness, Keith Dunn's sister, is referred to by the parties and the court either as Gail Frey, or Gail Dunn. For consistency we use "Gail Frey."